**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CA-00388-SCT**

*TONI DAE ANDERSON CHRISTIAN*

*v.*

*DAVID ANTHONY WHEAT*


| | |
|---|---|
| DATE OF JUDGMENT: | 1/10/2003 |
| TRIAL JUDGE: | HON. SEBE DALE, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | PENNY JONES ALEXANDER |
| ATTORNEY FOR APPELLEE: | JOSEPH EDGAR FILLINGANE |
| | W. J. GAMBLE, III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND RENDERED - 07/01/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The mother of a four-year old boy appeals from the chancery court's granting of visitation to the boy's natural father, who is in the custody of the Mississippi Department of Corrections and is incarcerated in the South Mississippi Correctional Institution in Leakesville, Mississippi. David Anthony Wheat (Wheat) was adjudicated the natural father of Anthony Gabriel Wheat (Gabe) as the result of a Petition for Judgment of Filiation filed by Gabe's mother, Toni Dae Anderson Christian (Christian). The order of filiation awarded Christian full care, custody and control of Gabe, and held in abeyance and suspended all matters of visitation and child support until Wheat was released from the penitentiary. Three months later, Wheat filed

the petition for modification of visitation, and was granted monthly visitation at the penitentiary. Christian filed motions for reconsideration and a new trial, and a motion to stay the order with the chancery court, which were denied. She then filed an appeal to this Court. Additionally, Christian filed a Motion to Stay Pending Appeal and a Motion to Suspend Rules and for Reconsideration of Motion to Stay Pending Appeal with this Court, which were both denied.

¶2. Because Wheat did not meet his burden of showing that visitation was in the best interest of the young child, we reverse and render against Wheat and in favor of Christian.

**FACTS**

¶3. Although Christian and Wheat never married, they had a son, Gabe, who was born December 2, 1998. Wheat has been incarcerated since January, 2000, and in June, 2001, he was sentenced to two concurrent ten-year prison sentences with five additional years of post release supervision, one for robbery and one for sale of a controlled substance. Wheat testified that he works as a trustee doing refrigeration work outside of the prison, has accumulated three years of trustee time and will be released from prison in October of 2006.

¶4. Christian filed her Petition for Judgment of Filiation in March, 2002. In awarding full custody to Christian, the Forrest County Chancery Court stated:

> It is, therefore, ordered and adjudged that the Defendant, David Anthony Wheat, is the natural father of the minor child, Anthony Gabriel Wheat, and that the mother of the minor child, Toni Dae Anderson, is hereby awarded the full care, custody, and control of said minor child, and **that all matters pertaining to visitation on behalf of the Defendant**, child support, hospitalization, medical, and dental on behalf of the minor child **are hereby held in abeyance and suspended until the Defendant is released from the confines of the Mississippi State Penitentiary**.

(emphasis added). Three months later, Wheat filed a Petition for Modification, requesting visitation with his son at the prison, stating that the paternal grandmother would be responsible for transporting the child

2

back and forth. Christian responded negatively, saying that the issue of visitation was settled with the Judgment of Filiation, which denied visitation while Wheat remained in prison, and requested the court to maintain that position. A hearing was held in January, 2003, at which the chancellor heard testimony from only Christian, Wheat, Christian's father and Wheat's mother.

¶5. There are many facts in dispute in this case, including: the amount of time Wheat spent with Gabe and the amount of support that Wheat and his family provided for Gabe; whether Wheat left Christian or Christian left Wheat; whether Wheat tried to maintain a relationship with the child or if he was prevented from doing so. There was evidence presented that Wheat and his mother provided a minimum amount of support for Gabe until around January, 2002.

¶6. There was no dispute that prior to March, 2002, Christian allowed visitation to Gabe's paternal grandparents. It is disputed whether she authorized the grandparents to take Gabe to see Wheat in prison on several occasions. In March, 2002, Christian terminated the visitation saying that she did not want Gabe taken to the prison to see Wheat.

¶7. There was testimony from Wheat and his mother concerning the visiting area at the prison. Wheat presented the area as a room approximately 60' X 60', with a TV, play room, coloring books, swings, and vending machines, where the guards do not have weapons, and there are always kids there on visiting days. He stated that the kids think it is like a McDonald's play house.

¶8. Christian testified that she did not want Gabe going to the prison because he was at a very impressionable age. Additionally, Christian said that Gabe barely knew Wheat, and that Wheat had had a year to build a relationship with Gabe, but did not do it. But she also gave conflicting testimony that she did not want Wheat around Gabe, and she and her father prevented Wheat from coming around because

3

he took drugs and was dangerous. She also testified that she filed the petition for filiation in order to get custody so that she could prevent Gabe from being taken to the prison.

¶9. Christian's father testified that he believed that it was dangerous for Wheat's parents to take Gabe anywhere because they drink and could have an accident. Prior to this testimony, Chancellor Dale had questioned Marsha Wheat on her driving record and whether she had insurance. She testified that she had insurance and had never gotten a traffic citation of any kind.

¶10. In a bench ruling on January 10, 2003, the chancellor granted Wheat's visitation request, stating:

> Toni doesn't want her child to visit with her child's father, with whom she lived for a long period of time, and by that brought this child into the world, because he's in prison. Well, that child's going to know he's in prison if he doesn't know it now. If he doesn't see him until he's ten years old, he's going to know his father was in prison. And that's a fact he's going to have to live with, which he did not contribute to.
>
> David has a lot to make up for and what he has short changed his child, and it's going to be an obligation he's going to be faced with for a long period of time. I think the Court could, of its own volition, impose an obligation for accruing child support, but it wouldn't do any good. But if I'm still around when Dave gets out of the penitentiary and they start looking for child support, I'll remember it and I'll be aware of all the circumstances. I'll take [sic] to make some requirements that might be other than the usual requirements.
>
> David, by his own voluntary action, has placed himself in a position where he can't discharge the obligations that law imposes on him. Whether these parents like it or not they're the ones that are responsible for this child being in this world and being forced to live with facts and circumstances as they exist and not as they would like to have them exist. And the child may get to be several years old or an adult and decide his father ain't worth a you know what, but that's his opportunity to arrive at that conclusion and not to be taught that by somebody else.
>
> The facts are what they are. And you don't do children any particular great favor when you try to shield from them knowledge of what the facts are. If they got a no-good mama and daddy, they're going to find it out, and they're entitled to find it out for themselves. It's not a pleasant thing to visit somebody in your family at a prison. I have had great opportunity to observe that having served for a number of years on the penitentiary board. I know what went on in the penitentiary, and I know what visitation was. I could observe what the impact was on families, those on the outside as well as

4

those on the inside. It is not a good situation. But try as you might, you're not going to keep this young child from knowing exactly what's gone on. One way or another he's going to know.

It is not because Gabe deserves -- I mean David deserves it because his conduct -- if we just wanted to judge him on his conduct, the law would say he's forfeited most of his rights. He doesn't deserve much. He's where he is by his own voluntary conduct. It is not the prerogative of the other parent to make the ultimate judgment for Gabe about relationship with his father. You can advise, you can counsel, you can undertake to make him understand proper conduct and good moral principles and what's acceptable in society and what's not acceptable, but you can't shield him from being exposed to realties of life.

It's my opinion that a youngster is entitled to have an opportunity by exposure under proper circumstances to both parents. Protections have to be imposed and risks that could be there have to be limited and removed if possible. It is my finding and opinion that this child is entitled to be exposed to his imprisoned father -- not extensively. That will depend upon the relationship that can be brought to exist between the parent and the child.

It is not Toni's place to tell Gabe that his father is a no good so and so nor vice versa for Gabe -- for David to tell Gabe that his mother is narrow-minded and doesn't like him and is not going to do anything to show kindness or consideration toward him. He's going to find all that out for himself. Y'all don't have to try to tell him. If you start trying to tell him and shape his mind about the other one, you may be doing your own self damage. You better stop and think about that.

I'm going to provide visitation . . .(discussion of visitation details)

I reiterate, I think the child is entitled to have an opportunity to know both his parents. And as time progresses to come a point when he gets old enough and his mind matures enough to begin to make his own decisions about his relationship with his parents and his assessments of their worth in his life.

¶11. The visitation order allowed for visitation one Saturday per month, with the stipulation that Marsha Wheat pick Gabe up at Christian's home at 8:30 a.m. on Saturday morning and return him by 4:00 p.m. that same day. Christian appealed from this order granting visitation while Wheat is incarcerated.

¶12. Christian brings one issue for appeal: whether the best interest of the child was considered before the order for visitation was imposed. She argues that the chancellor did not consider the child's best interest because there was no testimony introduced concerning the child's best interest and no finding by

the chancellor that the child's best interest was even considered. Wheat contends that the best interest of the child was considered, and that the chancellor found that is was in the best interest of the child to have some exposure to his incarcerated father, who wishes to be part of his son's life.

## ANALYSIS

¶13.    Visitation and restrictions placed upon it are within the discretion of the chancery court. *Newsom v. Newsom*, 557 So.2d 511, 517 (Miss. 1990); *Clark v. Myrick*, 523 So.2d 79, 83 (Miss. 1988); *Cheek v. Ricker*, 431 So.2d 1139, 1146 (Miss. 1983). Where a chancellor has made factual findings on the matter of visitation, this Court will not disturb those findings unless his findings are not supported by substantial credible evidence, he has committed manifest error, or he has applied the erroneous legal standard. *Bredemeier v. Jackson*, 689 So.2d 770, 775 (Miss. 1997). However, while being attentive to the rights of a non-custodial parent, he must keep the best interest of the child as his **paramount concern**. *Harrington v. Harrington*, 648 So.2d 543, 545 (Miss. 1994).

¶14.    A party seeking the modification must show that a prior decree is not working and that a modification is in the best interests of the child. *Cox v. Moulds*, 490 So.2d 866, 869 (Miss. 1986). Wheat supplied no testimony concerning what would be in Gabe's best interest. There was no showing that it would be advantageous in any way for Gabe to visit Wheat in prison. On the other hand, Christain testified that Wheat was dangerous and that she was fearful of him. She also testified that Gabe was very young and impressionable, and she was concerned about Gabe being at the prison. She also testified that Gabe did not know his father, and Wheat did not dispute this. The chancellor, in his bench ruling, even discussed that visitation in a prison setting is "not a good situation." Particularly in light of this contrary testimony, it was incumbent upon Wheat to make some showing that modification to allow the visitation was in the best interest of the child, and for the chancellor to keep the best interest of the child as his

6

paramount concern. The chancellor made no finding of what would be in the child's best interest; he simply stated that he felt that the child is entitled to have an opportunity to know both parents. It is hard for us to understand how the chancellor can make a determination that must be based on the best interest of this child without hearing any testimony concerning the child's best interest. The only testimony heard by the chancellor was from Gabe's parents, his maternal grandfather and paternal grandmother, and none of this testimony concerned Gabe's best interest. There was no testimony by anyone else, professional or otherwise, regarding what, if any, impact the exposure to the prison environment might have on an impressionable four or five year old boy. Should this case come before this Court again on a subsequent petition for modification, it is imperative that the party seeking the modification show proof of the best interest of the child.

¶15.    The specific question of visitation rights of incarcerated parents has not heretofore been addressed by this court, and because we render in this case on different grounds, we do not include an analysis of the question here. Jurisdictions which have reached the question of visitation rights of incarcerated parents generally express that incarceration, alone, is not sufficient to preclude visitation.[1] The courts which have denied visitation most often have done so where the incarcerated parent has been convicted of a violent crime, particularly if the crime was committed against the child, and there is evidence that the parent would be a threat to child. *See In re Hall*, 582 N.E.2d 1055 (Ohio Ct. App. 1989); *Pacheco v. Bedford*,

---

[1] *See Nicholson v. Choctaw County*, 498 F. Supp. 295 (S.D. Ala.1980); *Valentine v. Englehardt*, 474 F. Supp. 294 (D.N.J. 1979); *O'Bryan v. County of Saginaw*, 437 F. Supp. 582 (E.D. Mich.1977); *Mabra v. Schmidt*, 356 F. Supp. 620 (W.D. Wis.1973); *Michael M. v. Arizona Dept. of Econ. Security*, 42 P.3d 1163, 1165 (Ariz. Ct. App. 2002); *In re Smith*, 112 Cal. App.3d 956, 169 Cal. Rptr. 564 (1980); *Hoversten v. Superior Court*, 74 Cal. App.4th 636, 88 Cal. Rptr.2d 197 (1999); *Smith v. Smith*, 869 S.W.2d 55, 57 (Ky. App. 1994); *Nielsen v. Nielsen*, 348 N.W.2d 416 (Neb. 1984); *Hervieux v. Hervieux*, 603 A.2d 337, 338 (R.I. 1992); *Suttles v. Suttles*, 748 S.W.2d 427, 429 ( Tenn. 1988).

787 A.2d 1210 (R.I. 2002); *Suttles v. Suttles*, 748 S.W.2d at 429. In one of these cases, the court stated that transporting a child to prison on a regular basis gives a presumption that visitation is not in the child's best interest. *In re Hall*, 582 N.E.2d at 1057. Because this issue has not been raised in this case, we decline to rule on it at this time.

## CONCLUSION

¶16. Because there was no proof that visitation in the present case would be in the child's best interest, we reverse the chancellor's judgment, and we render judgment that visitation is terminated until such time as it can be shown that it is in the best interest of the child to resume visitation.

¶17. **REVERSED AND RENDERED.**

    **SMITH, C.J., WALLER, P.J., CARLSON DICKINSON, AND RANDOLPH, JJ., CONCUR. EASLEY, J., CONCURS IN RESULT ONLY. GRAVES, J. DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**